UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JOSHUA J. WATERHOUSE,<br><br>                Plaintiff,<br><br>        v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br><br>                Defendant. | 2:15-CV-306-FVS<br><br>**ORDER AFFIRMING DECISION** |

**THIS MATTER** comes before the Court based upon the parties' cross

motions for summary judgment.  At issue is the validity of a decision denying

Joshua J. Waterhouse's application for supplemental security income.   He is

represented by David L. Lybbert.  The Acting Commissioner is represented by

Amanda Schapel.

**BACKGROUND**

Joshua J. Waterhouse was born on February 21, 1990.  (TR 50.)  During

2012, he applied for Title XVI supplemental security income ("SSI").  42 U.S.C. §§

1381-1383f.  The Social Security Administration ("SSA") denied his initial

Order ~ 1

application and his request for reconsideration, whereupon he exercised his

right to a hearing before an administrative law judge, who issued an unfavorable

ruling on June 2, 2014.  Mr. Waterhouse challenges determinations the ALJ made

at steps two, four, and five in the SSA's five-step sequential evaluation process.

20 C.F.R. § 416.920(a)(4).

At step two, the ALJ had to decide whether Mr. Waterhouse is severely

impaired.  20 C.F.R. § 416.920(a)(4)(ii).  He found Mr. Waterhouse suffers from

"[l]eft inguinal hernia, status post mesh repair with ongoing pain; testicular pain;

dysthymic disorder[1] ; learning disorder, not otherwise specified; pain disorder;

[and] gastritis[.]"  (TR 22.)  Mr. Waterhouse says the ALJ's finding is correct as

far as it goes, but, in his opinion, it does not go far enough.  He alleges he is

significantly more impaired than the ALJ acknowledged.

---

[1] Dysthymic disorder" is "a chronic mood disorder characterized by depressed

feeling (sad, blue, low) . . . ."  (http://medical-

dictionary.thefreedictionary.com/browse/dysthymia (quoting Miller-Keane

Encyclopedia and Dictionary of Medicine) (last visited March __, 2017).

Order ~ 2

At step four, the ALJ had to formulate Mr. Waterhouse's residual functional capacity ("RFC"). 20 C.F.R. § 416.920(a)(4)(iv). In order to complete this task, the ALJ analyzed his ability to perform specific work-related functions. SSR 96–8p, 1996 WL 374184, at *3 (July 2, 1996). This analysis enabled the ALJ to determine the most he can do despite his impairments. 20 C.F.R. § 416.945(a)(1). Typically, an ALJ will express a claimant's RFC in terms of an exertional level, *i.e.*, whether the claimant is capable of performing a job that is "sedentary, light, medium, heavy, [or] very heavy." 20 C.F.R. § 416.967.

Determining a claimant's RFC is fact intensive. Here, the ALJ was confronted with conflicting evidence. Ultimately, he gave little weight to the opinions of two examining physicians (Shannon Radke, M.D., and Geoff Jones, M.D.) and two examining psychologists (Mahlon Dalley, Ph.D., and John Arnold, Ph.D.). Not only that, but also the ALJ discounted Mr. Waterhouse's description of his symptoms. The ALJ's assessment of the evidence led him to find Mr. Waterhouse has the "residual functional capacity to perform light work," though

Order ~ 3

his ability to work at that exertional level is subject to a number of limitations.

(TR 24.)

Having made that finding, the ALJ was in a position to determine whether

Mr. Waterhouse is capable of performing "past relevant work." See 20 C.F.R. §

416.965(a). As the ALJ noted, Mr. Waterhouse has limited work experience.

However, such jobs as he has held have required at least a medium level of

exertion. (TR 68.) The ALJ found he no longer is capable of holding jobs that

require a medium exertional level. Consequently, he cannot perform his past

relevant work. (TR 30.) That being so, the ALJ pressed on to the final step in the

sequential evaluation process.

At step five, the ALJ had to determine whether Mr. Waterhouse can make

the adjustment to other types of work given his age, education, work experience,

and RFC. 20 C.F.R. § 416.920(a)(4)(v). The burden in that regard falls upon the

Commissioner, who must provide evidence "demonstrating other work exists in

significant numbers in the national economy that [the claimant] can do, given

[his] residual functional capacity and vocational factors[.]" 20 C.F.R. §§

Order ~ 4

404.1560(c)(2); 416.960(c)(2).  The Commissioner may satisfy the burden

either "(1) by the testimony of a vocational expert, or (2) by reference to the

Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2." *Lounsbury*

*v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir.2006).  Here, the ALJ asked a

vocational expert to testify.  Based upon his testimony, the ALJ found "there are

jobs that exist in significant numbers in the national economy that [Mr.

Waterhouse] can perform."  (TR 30.)  According to the ALJ, the list of jobs

includes "small products assembler," "production inspector," and "hand packer."

(TR 31.)  Since, in the ALJ's opinion, Mr. Waterhouse "is capable of making a

successful adjustment to other work that exists in significant numbers in the

national economy[,]" he is not disabled.  *Id.*

Mr. Waterhouse asked the Appeals Council to review the ALJ's unfavorable

ruling.  In support of his request, he submitted an assessment that was signed by

both Chris Buscher, a physician's assistant, and Geoff Jones, a physician.  (TR 5.)

The assessment states:

Order ~ 5

> For medical reasons, please excuse [Joshua J. Waterhouse] from any work. Josh continues to be seen in our clinic for ongoing chronic pain, chronic diarrhea.  He is unable to work at this time.  We continue to perform testing to try and get Josh back to full health.

(TR 713.)  The Appeals Council considered the assessment, but nevertheless denied review on September 16, 2015.  At that point, the ALJ's unfavorable ruling became the final decision of the Commissioner of the Social Security Administration.  20 C.F.R. § 416.1484(b)(2).  Mr. Waterhouse commenced this action on November 4, 2015.

**STANDARD OF REVIEW**

A district court may enter "judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  However, review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  *Id.*  As a result, the Commissioner's decision "will be disturbed only if it is not supported by substantial evidence or it is based on legal error."  *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir.1986).  "Substantial evidence means more than a mere scintilla, . . . but less than a

Order ~ 6

preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576

(9th Cir.1988) (internal punctuation and citations omitted).

**ANALYSIS**

*Dr. Shannon Radke, M.D.*

On May 10, 2010, Dr. Shannon Radke, M.D., conducted a physical

examination of Mr. Waterhouse at the request of the Washington Department of

Social and Health Services ("DSHS"). (TR 590.) Dr. Radke diagnosed hydrocele[2]

and abdominal pain. (TR 589.) In view of her diagnosis, she determined Mr.

Waterhouse would be unable to perform jobs that required more than sedentary

work, *id.*, though she also thought his physical problems were amenable to

treatment. (TR 590.) On January 5, 2011, Dr. Radke conducted a supplemental

examination. (TR 592.) She found that Mr. Waterhouse's ability to perform

several basic movements -- standing, sitting, and lifting -- was impaired. *Id.*

---

[2] The term "hydrocele" refers to a "pathological accumulation of serous fluid in a
bodily cavity, especially in the scrotal pouch." (http://medical-
dictionary.thefreedictionary.com/browse/hydrocele (quoting American
Heritage Dictionary) (last visited March __, 2017).

Order ~ 7

Accordingly, she recommended he "[a]void frequent bending, avoid twisting at waist." (TR 592.) She estimated he would remain impaired for six months. (TR 591.)

The ALJ gave Dr. Radke's 2011 assessment "little weight." (TR 30.) While he did not question the validity of her assessment at the time she rendered it, he decided it had limited probative value in 2014. Mr. Waterhouse disagrees with the ALJ's decision to discount the significance of Dr. Radke's 2011 assessment. He argues the ALJ should have ignored her estimated recovery time because, contrary to her expectations, the conditions she diagnosed did not go away.

It is important to remember Dr. Radke rendered her assessment of his impairments based upon the symptoms she observed on January 5, 2011. At about the same time or, perhaps, shortly thereafter, he had hydrocele surgery.[3] The procedure appears to have been at least partially successful, because the hydrocele diminished in size between May 11, 2010, and September 19, 2011.

---

[3] Dr. Radke says surgery occurred on January 4, 2011. (TR 591-92.) By contrast, Dr. Sara K. Ragsdale, D.O., says it occurred at some point during February. (TR 266.)

Order ~ 8

(TR 266.)  It's unclear whether Dr. Radke would have revised her assessment of

Mr. Waterhouse had she examined him during the summer or fall of 2011.

However, the fact remains she did not perform such an examination.

Consequently, the ALJ had to decide how much weight to give to an assessment

that was made before he fully recovered.  Since Mr. Waterhouse's condition

appears to have improved as a result of surgery, it was not unreasonable for the

ALJ to question whether Dr. Radke's 2011 assessment remained relevant several

years later.

   *Dr. Geoffrey Jones, M.D.*

   On October 25, 2010, Dr. Geoffrey Jones, M.D., performed a physical

examination of Mr. Waterhouse at the request of the Washington DSHS.  Dr.

Jones diagnosed several abnormalities, two of which he thought would affect Mr.

Waterhouse's ability to perform work-related activities.  The more severe of the

two was the hydrocele Dr. Radke also observed.  (TR 583.)  Dr. Jones thought the

condition required surgery (TR 584), and he thought Mr. Waterhouse's ability to

work would remain impaired for at least three months.  (TR 585.)  That said, it

Order ~ 9

appears Dr. Jones was guardedly optimistic surgery would relieve Mr.

Waterhouse's symptoms.  He recommended reevaluation of Mr. Waterhouse

employability two to three weeks following surgery.  (TR 584.)  Until then, Dr.

Jones thought Mr. Waterhouse should limit himself to sedentary work.  (TR 583.)

The ALJ discounted Dr. Jones' determination.  Apparently, he decided it

had lost most of its probative value by the time he conducted the administrative

hearing in 2014.  Mr. Waterhouse disagrees with the ALJ's assessment of Dr.

Jones' determination.  He claims the ALJ should have given it more weight.

Once again, it is important to note Dr. Jones' made his determination prior

to hydrocele surgery.  In fairness to Mr. Waterhouse, the surgery may not have

helped as much as Dr. Jones expected.  For example, on January 13, 2012, Mr.

Waterhouse advised a physician's assistance he was experiencing "[c]hronic

testicular pain[.]"  (TR 380.)  However, whether or not the surgery accomplished

as much as Dr. Jones expected, it is clear Mr. Waterhouse's symptoms changed

between 2010 and 2014.  Consequently, it was appropriate for the ALJ to

consider Mr. Waterhouse's changed symptoms in deciding how much weight to

give to a determination Dr. Jones made prior to surgery.

*Mahlon Dalley and John Arnold*

On February 6, 2012, Mahlon Dalley, Ph.D., conducted a psychological

examination of Mr. Waterhouse at the request of the Washington DSHS.  As part

of the process, Dr. Dalley administered a number of psychological tests.  (TR

360-61.)  He diagnosed "Pain Disorder Associated with Both Psychological

Factors and a General Medical Condition; Dysthymic Disorder, Late Onset; [and]

Learning Disorder NOS."  (TR 356.)  This diagnosis led to a pessimistic

prognosis.  Dr. Dalley concluded that "features of Mr. Waterhouse's depression,

anxiety, and health concerns are likely to interfere with his ability to be

successful in a normal employment position; therefore, it is estimated that he

will be work impaired for a 12 . . . [month] time period.[4] "  (TR 358.)

The ALJ considered Dr. Dalley's assessment, but gave it "little weight."  (TR

29.)  First, the ALJ was concerned Dr. Dalley's diagnosis is based largely upon Mr.

---

[4] The quoted material has been modified to correct a typographical error.

Waterhouse's subjective complaints about his physical impairments.  Second,

the ALJ was concerned Dr. Dalley's finding concerning anxiety is not supported

by test results.  Third, he was concerned Dr. Dalley's ultimate conclusion -- *i.e.*,

that Mr. Waterhouse is unable to work -- is contradicted by the results of some

of the psychological tests Dr. Dalley administered.  Finally, the ALJ was

concerned by the fact a consulting psychologist who reviewed Dr. Dalley's report

does not think his conclusions are supported by the data he relied upon.

The consulting psychologist who reviewed Dr. Dalley's report is R. Renee

Eisenhauer, Ph.D.  Dr. Eisenhauer disagrees with Dr. Dalley's determination Mr.

Waterhouse suffers from "[p]ain disorder associated with psychological and

medical factors."  (TR 600.)  In her opinion, in order for such a diagnosis to be

warranted, the record would have to include evidence indicating "that

psychological factors play a significant factor in the causation, maintenance or

exacerbation of the pain."  (TR 600.)  Dr. Eisenhauer does not think the record

contains such evidence.  Thus, according to her, the disputed diagnosis is

unsupported.  (TR 600.)  And that is not all.  She also questions Dr. Dalley's

Order ~ 12

interpretation of the test results.  While she acknowledges Mr. Waterhouse has a "low average" IQ, and while she acknowledges some of his test results were "borderline," she nevertheless thinks "he retains the ability to engage in simple as well as complex tasks from a cognitive perspective."  (TR 600.)

      As Mr. Waterhouse points out, an ALJ may not discount the opinions of an examining expert based solely upon a contrary opinion from a consulting expert. *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999).  The preceding principle applies with special force in this case because Dr. Dalley's opinions are congruent with those of John Arnold, Ph.D., a clinical psychologist who examined Mr. Waterhouse on February 21, 2012.  Dr. Arnold diagnosed "Dysthymic Disorder, Late Onset R/O Social Phobia (generalized) Learning Disorder, NOS (by hx) Pain Disorder w/both psych factors & a general medical condition."  (TR 624.)  In view of his diagnosis, Dr. Arnold thought Mr. Waterhouse would experience "marked" limitations upon his ability to "[u]nderstand, remember, and persist in tasks by following detailed instructions"; "[p]erform activities within a schedule, maintain regular attendance, and be punctual . . . without

Order ~ 13

special supervision"; "[l]earn new tasks"; "[m]aintain appropriate behavior in a

work setting"; and "[c]omplete a normal work day."  (TR625.)

      The ALJ was not persuaded by Dr. Arnold's assessment, according it "little

weight."  (TR 29.)  The ALJ thought Dr. Arnold's assessment was unduly

pessimistic given Mr. Waterhouse's performance during the mental status

examination, the fact he has not participated in mental health treatment, and his

ability to perform the activities that are required for daily living.  (TR 29.)

      Dr. Arnold was not the last expert to assess the impact of Mr. Waterhouse's

psychological impairments.  On two subsequent occasions during 2012, the

Social Security Administration asked mental health professionals to review Mr.

Waterhouse's file.  The first of the two reviews was conducted by Eugene Kester,

M.D., a psychiatrist.  Based upon the information that was available to him, Dr.

Kester made several important findings:  First, he found Mr. Waterhouse "can

understand and remember simple instructions, but due to his lower academic

training and skills, as well as possible learning disability[,] he will have

increasing difficulty understanding increasingly complex or detailed tasks."  (TR

Order ~ 14

85.)  Second, Dr. Kester found Mr. Waterhouse "would work best in [an]
environment that does not involve close contact w/ co-workers or [the] general
public."  (TR 86.)  Finally, Dr. Kester found Mr. Waterhouse "may need extra time
and/or instruction in learning new tasks. . . .  He is able to make simple plans
and follow basic instructions."  (TR 87.)

The ALJ gave "significant weight" to Dr. Kester's findings.  To begin with,
he thought they were supported by the record.  In addition, he noted they were
ratified by Sharon Underwood, Ph.D., a psychologist.  (TR 98-100.)  She, too,
reviewed Mr. Waterhouse's medical and psychological records.  (TR 92-94.)  And
like Dr. Kester, she thought Dr. Dalley's assessment was unduly pessimistic.

Neither Dr. Eisenhauer nor Dr. Kester nor Dr. Underwood examined Mr.
Waterhouse.  Instead, they based their determinations upon a review of his
medical and psychological records.  By contrast, both Dr. Dalley and Dr. Arnold
examined Mr. Waterhouse.  Since they are examining experts, the ALJ was
authorized to discount their respective assessments only if he provided "specific
and legitimate reasons" that are "supported by substantial evidence in the

Order ~ 15

record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998).  Whether the ALJ

satisfied that standard is a close question.

It is useful to begin with the test results.  While Mr. Waterhouse must cope

with significant cognitive limitations, he is not devoid of ability.  For example, Dr.

Arnold found he is able to "[u]nderstand, remember, and persist in tasks by

following very short and simple instructions."  (TR 625.)  Not only that, but also

he is able to "[p]erform routine tasks without special supervision." *Id.*

Furthermore, Mr. Waterhouse did reasonably well on the mental status exams

Dr. Dalley administered.  (TR 358.)  Finally, and perhaps most importantly, there

is reason to believe Mr. Waterhouse's psychological problems are amenable to

treatment.  Dr. Dalley thinks Mr. Waterhouse "should begin counseling to gain

understanding of psychological issues that may be underlying his physical

concerns and also help lessen his anxiety and depression."  (TR 358.)  He

recommended reevaluation after 12 months of treatment.  *Id.*  Similarly, Dr.

Arnold recommended, "Stable housing/Medical care and psychiatric

svs/counseling."  (TR 626.)

Order ~ 16

Mr. Waterhouse's potential amenability to treatment is an important consideration in determining whether he is disabled. "An individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability." SSR 82-59, 1982 WL 31384, at *1 (1982). Obviously, this regulation is not directly on point. While both Dr. Dalley and Dr. Arnold recommended counseling, neither of them offered to provide it. And it does not appear Mr. Waterhouse has sought counseling on his own.

Admittedly, it may be difficult for Mr. Waterhouse to obtain the mental health treatment he needs, but the fact it may be difficult does not mean it is impossible. He is a comparatively young man -- 24 years old at the time of the administrative hearing. While he faces significant challenges, he is not helpless. His repeated requests for medical treatment indicate he is capable of looking out for himself. *See infra* pp. 19-23. Thus, it was reasonable for the ALJ to expect

Order ~ 17

him to seek counseling; just as it was reasonable for the ALJ to assume Mr. Waterhouse's mental impairments are potentially amenable to treatment. After all, both Dr. Dalley and Dr. Arnold recommended counseling. Presumably, they made the recommendation because they thought it would help.

All of which leads to a critical consideration. Drs. Dalley and Arnold rendered their psychological assessments before Mr. Waterhouse sought or received counseling. If, in fact, Mr. Waterhouse's psychological problems are amenable to treatment (and such a finding is supported by substantial evidence), then Dr. Dalley's and Dr. Arnold's assessments may turn out to be unduly pessimistic. It well may be that once Mr. Waterhouse begins to participate in counseling, he will be able to manage his problems well enough to find gainful employment. Of course, it remains to be seen whether counseling will be efficacious. However, until the results are in, it is appropriate to treat Dr. Dalley's and Dr. Arnold's assessments with respectful skepticism. Thus, the ALJ did not err in declining to accept their pessimism as the final word on Mr. Waterhouse's psychological condition.

*Joshua Waterhouse*

Mr. Waterhouse has been treated on numerous occasions.  The following is a representative sample:  On March 21, 2012, he went to Dr. Jones complaining of "stomach ache and throat issues."  (TR 376.)  Dr. Jones diagnosed GERD [gastroesophageal reflux disease] and H. Pylori.[5] "  (TR 376.)  He prescribed medications, but in doing so, he noted "no acute distress . . . normal mood and affect; normal attention span and concentration."  (TR 377.)  On April 12, 2012, Mr. Waterhouse went to Dirk Sypherd, M.D., complaining of "bilateral inguinal pain[.[6] ]"  (TR 498.)  Dr. Sypherd tentatively diagnosed "chronic epididymitis.[7] "

---

[5] "Helicobacter pylori" is "a gram-negative spiral bacterium that causes gastritis and pyloric ulcers in humans[.]"  (http://medical-dictionary.thefreedictionary.com/browse/helicobactor plyori (quoting Miller-Keane Encyclopedia and Dictionary of Medicine) (last visited  March __, 2017).

[6] "Inguinal" means "pertaining to the groin."  (http://medical-dictionary.thefreedictionary.com/browse/inguinal (quoting Miller-Keane Encyclopedia and Dictionary of Medicine) (last visited March __, 2017).

[7] "Epididymitis" is an "inflammation or infection of the epididymis.  In this long coiled tube attached to the upper part of each testicle, sperm mature and are stored before ejaculation."  (http://medical-

(TR 499.)  He prescribed "[c]onservative treatment."  Id.  On November 29, 2012,

Mr. Waterhouse went to Sara K. Ragsdale, D.O., complaining of episodes of

stomach pain.  (TR 658.)  He also told her he "keeps getting a lump in his throat."

*Id.*  Dr. Ragsdale treated the latter with a medication for "post nasal drainage."

(TR 659.)  However, she could not identify the source of the stomach pain.  In the

end, all she could do was advise him to refrain from eating or drinking things

that "worsen reflux."  *Id.*  Mr. Waterhouse returned to Dr. Ragsdale on December

17, 2012.  He indicated, "He is nauseous if he doesn't eat.  He vomits 1-2 times

per week.  He has heartburn every day.  He has occasional diarrhea, [but] no

bloody or black stools."  (TR 662.)  As before, Dr. Ragsdale was unable to identify

the source of his complaints.  She adjusted his medications, discussed the

possibility his use of marijuana was causing vomiting, and referred him to a

gastroenterologist.  (TR 663.)  On January 21, 2013, Philip M. Coff, M.D.,

performed an upper endoscopy.  (TR 668.)  Dr. Coff diagnosed "[r]eflux

---

dictionary.thefreedictionary.com/browse/epididymitis (quoting Gale
Encyclopedia of Medicine) (last visited Feb. __, 2017).

Order ~ 20

esophagitis, possible short segment Barrett's esophagus, mild gastritis, and duodenitis." *Id.* On March 27, 2013, Mr. Waterhouse returned to Dr. Sypherd complaining of a hernia, as well as testicular pain. Dr. Sypherd examined Mr. Waterhouse's scrotum, which appeared to be normal. (TR 643.) As for the hernia, Dr. Sypherd referred Mr. Waterhouse to a general surgeon. *Id.* On May 3, 2013, Mr. Waterhouse went back to Dr. Ragsdale complaining of "left inguinal pain." (TR 678.) And that was not his only complaint. He also complained he was unable to have a bowel movement "unless he [bore] down 'extremely hard'" (which hurt), just as he could not empty his bladder "without bearing down" (which also hurt). *Id.* Dr. Ragsdale noted he was "angry and tearful." He told her, "[N]obody cares what happens to me except me. You never do anything for me." *Id.* Dr. Ragsdale spent 30 minutes attempting to encourage Mr. Waterhouse, to little avail. In the end, the best she could do was refer him to a urologist in Spokane. (TR 679.) A number of months went by. On January 15, 2014, Mr. Waterhouse went to Chris Buscher complaining of "abdominal pain." (TR 617.) As will be recalled, the latter is a physician's assistant ("PAC"). PAC

Order ~ 21

Buscher ordered a number of tests, but he was unable to identify the source of

the pain.  (TR 618.)  Mr. Waterhouse next went to PAC Buscher on February 25,

2014.  He complained of GERD and painful urination.  (TR 704.)  PAC Buscher

had nothing to offer Mr. Waterhouse to ease the pain he was experiencing when

urinating.  As for the GERD symptoms, PAC Buscher gave Mr. Waterhouse

samples of a new medication and referred him to Dr. Jones for additional testing.

(TR 705-06.)  Dr. Jones examined Mr. Waterhouse on April 2, 2014, and decided

to perform an EGD.[8]  (TR 709.)  On May 1, 2014, Mr. Waterhouse went to PAC

Buscher complaining of "[l]ung congestion" and "productive cough."  (TR 710.)

Mr. Waterhouse denied "nausea, vomiting, diarrhea, [or] constipation."  *Id.*  He

was "alert and cooperative; normal mood and affect; normal attention span and

concentration."  (TR 711.)  PAC Buscher treated him for acute bronchitis.  *Id.*

---

[8] "EGD" is an "endoscopic examination of the interior of the esophagus, stomach, and initial portion of the duodenum."  (http://medical-dictionary.thefreedictionary.com/browse/EGD (quoting Miller-Keane Encyclopedia and Dictionary of Medicine) (last visited March __, 2017).

Mr. Waterhouse's appointment with PAC Buscher appears to have been his

last medical appointment before the administrative hearing, which took place on

May 21, 2014.  At the hearing, Mr. Waterhouse testified he experiences "[l]ots of

pain in his testicles and . . . groin."  (TR 56.)  He said the pain is exacerbated by

"walking, standing, going to the bathroom, sex."  *Id.*  He also testified he suffers

from alternating bouts of constipation and diarrhea.  (TR 57.)  He said he must

make repeated trips to the bathroom when an episode occurs.  (TR 57-8.)  In

addition to physical problems, Mr. Waterhouse also suffers from psychological

problems.  He testified he suffers from depression and anxiety.  (TR 59.)  He also

said he has trouble concentrating.  *Id.* [9]

---

[9] On June 10, 2014, Dr. Jones and PAC Buscher jointly issued a brief note

concerning Mr. Waterhouse's condition.  The note is quoted in full above.  While

it is from an acceptable medical source, it does not indicate what Mr.

Waterhouse is capable of doing despite his impairments.  20 C.F.R. §

416.913(b)(6).  The absence of such information limits the note's probative

value.  *Cf. Morgan v. Comm'r*, 169 F.3d 595, 601 (9th Cir. 1999) (an ALJ may

discount an expert opinion which does not "show how [a claimant's] symptoms

translate into specific functional deficits which preclude work activity").

Order ~ 23

The ALJ was not unsympathetic.  He found Mr. Waterhouse suffers from several severe impairments.  The ALJ further found his impairments reasonably could be expected to cause the types of symptoms he described.  (TR 25.) Consequently, the ALJ was required to evaluate "the intensity, persistence, and functionally limiting effects of the symptoms" in order to determine "the extent to which the symptoms affect [Mr. Waterhouse's] ability to do basic work activities."  SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996).  "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects."  *Id.*  If there is no evidence of malingering on the claimant's part, "the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so."  *Smolen v. Chater*, 80 F.3d 1273, 1283 (9th Cir.1996).

The ALJ had no trouble finding Mr. Waterhouse has severe physical impairments.  And yet, as the ALJ also observed, there have been instances in which Mr. Waterhouse complained of pain, but the health care provider who

Order ~ 24

examined him could not ascertain the source of the pain.  *See, e.g.*, TR 643 (Mr.

Waterhouse complained of testicular pain, but the examination of his left

scrotum was "entirely normal"); TR 617 (Mr. Waterhouse complained of

abdominal pain, but nothing showed up on a CT scan).  Now, the fact a health

care provider cannot find a source of pain does not mean the person is

malingering.  However, when a person repeatedly complains of pain, and there

are multiple occasions on which a health care provider cannot identify the

source of the pain, an ALJ reasonably may decide the person has a tendency to

overstate his symptoms.  The ALJ's concern in that regard was reinforced by

answers Mr. Waterhouse provided in a "Function Report" that is dated May 10,

2012.  (TR 205.)  In the report, Mr. Waterhouse acknowledged engaging in the

following activities:  helping care for his girlfriend's children (TR 199); helping

care for family pets, *id.*; completing his own personal care, *id.*; preparing simple

meals (TR 200); and helping with household chores and yardwork.  *Id.*  Of

course, the fact Mr. Waterhouse is able to engage in a number of activities that

are associated with daily living is not fatal to his disability claim.  "ALJs must be

Order ~ 25

especially cautious in concluding that daily activities are inconsistent with

testimony about pain, because impairments that would unquestionably preclude

work and all the pressures of a workplace environment will often be consistent

with doing more than merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d

995, 1016 (9th Cir.2014).

    Here, the ALJ exercised appropriate caution.  Nevertheless, his decision to

discount Mr. Waterhouse's description of his symptoms is controversial.  A

different ALJ might have given it more weight.  However, that does not mean the

ALJ erred.  The issue is whether he provided clear and convincing reasons for his

determination.  *Smolen*, 80 F.3d at 1283.  As explained above, the ALJ's principal

concern was that Mr. Waterhouse has a tendency to overstate his symptoms.

The ALJ's concern in that regard is supported by at least two circumstances;

namely, the fact health care providers were unable to substantiate some of Mr.

Waterhouse's complaints of pain, and the fact he reported engaging in activities

that indicate he has greater physical ability than he indicated during his

testimony at the administrative hearing.  While such evidence is not

Order ~ 26

overwhelming, it need not be.  The standard is much more generous.  As long as

the ALJ provided valid reasons for discounting Mr. Waterhouse's testimony (and

he did), and as long as the ALJ's reasons are supported by more than a scintilla of

evidence (and they are), then his decision to discount Mr. Waterhouse's

testimony is entitled to deference.  *Green*, 803 F.2d at 529.

**RULING**

Mr. Waterhouse suffers from severe physical and mental impairments.

That much is not in dispute.  Rather, the issue is the extent to which his

impairments limit his ability to work.  The ALJ decided Dr. Dalley, Dr. Arnold,

and Mr. Waterhouse were unduly pessimistic.  A reasonable person could

disagree with the ALJ in that regard.  However, in fairness to the ALJ, he had a

substantial basis for making the determinations he did.  Mr. Waterhouse is still a

young man.  While life is a struggle, he is not without ability.  He is capable of

performing important tasks.  Furthermore, there is reason to think his mental

impairments are amenable to treatment, and if he participates in therapy, not

only will he be better able to manage his mental impairments, but also he will be

Order ~ 27

better able to cope with his physical impairments.  All of this led the ALJ to find

Mr. Waterhouse has the "residual functional capacity to perform light work,"

though his ability to work at that exertional level is subject to a number of

limitations.  Were the Court considering the evidence de novo, it well might

reach a more pessimistic conclusion than did the ALJ.  But the Court is not

engaged in de novo review.  The Court's task is to determine whether the ALJ's

determinations are free from legal error and supported by substantial evidence.

Measured against that deferential standard, the ALJ's unfavorable ruling is

reasonable even though it is controversial.

    **IT IS HEREBY ORDERED**:

    1. "Defendant's Motion for Leave to File Excess Pages" (**ECF No. 18**) is

**granted**.

    2.  The defendant's motion for summary judgment (**ECF No. 19**) is

**granted** and the plaintiff's (**ECF No. 12**) is **denied**.

    3. The ALJ's decision of June 2, 2014 (**TR 32**) is **affirmed**.

Order ~ 28

**IT IS SO ORDERED**.  The District Court Executive is hereby directed to file this Order, enter judgment accordingly, furnish copies to counsel, and close the case.

**DATED** this 13th day of March, 2017.


                    s/Fred Van Sickle
                    FRED VAN SICKLE
            Senior United States District Judge

Order ~ 29